COLE AND JONES *v.* STATE.

4448                                      216 S. W. 2d 402

Opinion delivered January 10, 1949.

*Ross Robley* and *Elmer Schoggen,* for appellant.

*Guy E. Williams,* Attorney General and *Oscar E. Ellis,* Assistant Attorney General, for appellee.

ED. F. McFADDIN, Justice. This case has undergone a rather extensive judicial experience. The incidents giving rise to the case occurred in December, 1945; and this is the third opinion of this Court concerning the appellants' participation in those incidents.

Cole, Jones and Bean were indicted by the Grand Jury of Pulaski County, Arkansas, for a violation of Act 193 of 1943. A trial resulted in conviction of all three defendants. They appealed to this Court, and the judgments for conviction were reversed, and the causes remanded for a new trial. The constitutionality of the Act 193 was sustained, but the reversal was because of

errors occurring in the course of the trial. See *Cole et al.* v. *State,* 210 Ark. 433, 196 S. W. 2d 582. On remand to the Circuit Court, the Prosecuting Attorney elected to proceed on a new information rather than on the original indictment.[1] The information on which the defendants were tried, and from which comes the present appeal, reads in full as follows:

"Comes Sam Robinson, Prosecuting Attorney within and for Pulaski County, Arkansas, and in the name, by the authority, and on behalf of the State of Arkansas, information gives accusing Roy Cole, Louis Jones and Jessie Bean of the crime of felony, committed as follows, to-wit: On the 26th day of December, A. D. 1945, in Pulaski County, Arkansas, Walter Ted Campbell, acting in concert with other persons, assembled at the Southern Cotton Oil Company's plant in Pulaski County, Arkansas, where a labor dispute existed, and by force and violence prevented Otha Williams from engaging in a lawful vocation. The said Roy Cole, Louis Jones and Jessie Bean, in the County and State aforesaid, on the 26th day of December, 1945, did unlawfully and feloniously, acting in concert with each other, promote, encourage and aid such unlawful assemblage, against the peace and dignity of the State of Arkansas."

The trial on the information resulted in a conviction of all three defendants. They again appealed to this Court. The judgment of conviction against Bean was reversed and the cause against him was dismissed because of the insufficiency of the evidence. The judgments against Cole and Jones were affirmed. See *Cole et al.* v. *State,* 211 Ark. 836, 202 S. W. 2d 770. They petitioned the U. S. Supreme Court for *certiorari,* which was granted; and that Tribunal, in an opinion rendered on March 8, 1948, said:

"The convictions were for a violation of section 2. Petitioners urged in the State Supreme Court that the evidence was insufficient to support their conviction of a violation of section 2. They also raised serious objec-

---

[1] This procedure was sustained in the opinion in Cole et al. v. State, 211 Ark. 836, 202 S.W. 2d 770.

tions to the validity of that section under the Fourteenth Amendment to the Federal Constitution. None of their contentions were passed upon by the State Supreme Court. It affirmed their conviction as though they had been tried and convicted of a violation of section 1 when in truth they had been tried and convicted only of a violation of a single offense charged in section 2, an offense which is distinctly and substantially different from the offense charged in section 1.''

The opinion concluded with this directive: ''In the present state of the record we cannot pass upon those contentions which challenge the validity of section 2 of the Arkansas Act. The judgment is reversed and re manded to the State Supreme Court for proceedings not inconsistent with this opinion.''

When the mandate of the U. S. Supreme Court was filed in this Court, permission was granted for the filing of briefs on the questions presented by the mandate. In these new briefs the defendants (appellants) correctly take the position that the previous opinion of this Court and the holding of the U. S. Supreme Court dispose of all questions except two, which are: (1) the constitutionality of that part of § 2 of said Act 193 which is here involved; and (2) sufficiency of the evidence to sustain the verdicts of conviction under the information previously copied. We proceed to consider these questions.

I. *Constitutionality.* In assailing the constitutionality of said Act 193, appellants say that the Act is too indefinite to charge an offense, and also that the Act violates provisions of both the State and the Federal Constitutions and Amendments. Section 1 of Act 193 has been upheld by this court in several cases. See *Smith and Brown* v. *State,* 207 Ark. 104, 179 S. W. 2d 185 and *Guerin* v. *State,* 209 Ark. 1082, 193 S. W. 2d 997. In *Smith and Brown* v. *State* we said:

''. . . The Act here in question is an exact or *verbatim* copy of the Texas statute, Art. 1621b of Texas Penal Code as amended by Chap. 100, Acts 47th Legislature, Regular Session, Vernon's Ann. P. C. Art. 1621b,

except the latter statute carries an emergency clause, whereas, ours does not. On December 10, 1941, the Court of Criminal Appeals of Texas sustained the constitutionality of the Texas statute in *Ex parte Frye,* 143 Tex. Cr. R. 9, 156 S. W. 2d 531. On the same date the same Texas court sustained the same statute, in *Ex parte Sanford,* 144 Tex. Cr. R. 430, 157 S. W. 2d 899, on the authority of the Frye case. The Sanford case was appealed to the U. S. Supreme Court, where it was dismissed on the ground that it did not involve a federal question. *Sanford* v. *Hill,* 316 U. S. 647, 62 Sup. Ct. 1292, 86 L. Ed. 1731.''[2]

But we are here concerned with a portion of § 2 of the Act 193, the constitutionality of which portion has not been construed in a case where its provisions were at issue. The information on which the defendants were tried has been previously copied. In effect, it charged that Walter Ted Campbell, acting in concert with other persons, *assembled* where a labor dispute existed, and by force and violence prevented Otha Williams from working; and that ''the said Roy Cole, Louis Jones and Jessie Bean . . . did unlawfully and feloniously, acting in concert with each other, promote, encourage and aid such unlawful assemblage against the peace and dignity of the State of Arkansas.'' In short, the defendants, Cole and Jones, were charged with acting in concert, and promoting, encouraging and aiding the unlawful assemblage which prevented Otha Williams from engaging in a lawful occupation. So the defendants are charged with violating the final portion of § 2 of Act 193. Section 2 reads in its entirety:

''It shall be unlawful for any person acting in concert with one or more other persons, to assemble at or near any place where a 'labor dispute' exists and by force or violence prevent or attempt to prevent any person from engaging in any lawful vocation, or for any person acting either by himself, or as a member of any group or organization or acting in concert with one or

[2] The per curiam in the Sanford case was delivered by the U. S. Supreme Court on June 1, 1942. Our Act 193 was adopted in 1943.

more other persons, to promote, encourage or aid any such unlawful assemblage. Any person guilty of violating this section shall be deemed guilty of a felony, and upon conviction thereof shall be punished by confinement in the State Penitentiary for not less than one (1) year, nor more than two (2) years."

It is clear that this section charges two offenses, which we may for convenience refer to as "Offense A" and "Offense B." Offense A is embraced in the first 47 words of § 2, which reads: "It shall be unlawful for any person acting in concert with one or more other persons, to assemble at or near any place where a 'labor dispute' exists and by force or violence prevent or attempt to prevent any person from engaging in any lawful vocation, . . ."

Offense A applies to any person acting in concert to assemble, at a place where a labor dispute exists, and by force or violence, prevent or act to prevent any person from engaging in a lawful occupation. Offense B is embraced in the first four words of § 2 plus words 48 to 82 of said section, and reads: "It shall be unlawful . . . for any person acting either by himself, or as a member of any group or organization or acting in concert with one or more other·persons, to promote, encourage or aid *any such unlawful assemblage.*" (Italics supplied).

The words, "any such unlawful assemblage," as italicized above, relate to the assemblage in offense A, *supra,* so that offense B applies to any person (1) acting individually or in concert, etc., (2) to promote, encourage or aid "such unlawful assemblage" as that denounced in offense A, *supra*—that is, an assemblage which by force and violence prevents or attempts to prevent any person from engaging in any lawful vocation.

The question here to be decided is whether the promoting, encouraging or aiding "such unlawful assemblage" as contained in offense B is conduct which the State may denounce as an offense, and constitutionally prohibit. What is the "unlawful assemblage" which

the Act prohibits in § 2-A.?[3]   It is one where persons acting in concert have assembled in an attempt to prevent by force or violence some other person from engaging in a lawful occupation.   Keeping in mind such idea of an "unlawful assemblage," we come to offense B.   Since the State can prohibit the unlawful assemblage denounced in section 2-A[3] (the constitutionality of which, we have upheld),[4] then it seems clear that the State can also constitutionally prohibit by § 2-B[3] any person from promoting, encouraging or aiding "such unlawful assemblage."   It would be idle to say that the State could punish the participants under § 2-A[3] and not be allowed to punish those aiding and abetting such assemblage under § 2-B.[3]

Ever since the inception of its Statehood, the State of Arkansas has had a statute which was aimed at preventing rioting.[5]   Section 3503, Pope's Digest, comes to us from chapter 44, Div. VIII, Art. L, § 1 of the Revised Statutes of 1837; and reads:

If three or more persons assemble together with the intent, or being assembled, shall agree, mutually, to assist each other to do an unlawful act, with force or violence, against the person or property of another, or against the peace or to the terror of the people, and shall accomplish the purpose intended, or do any unlawful act in furtherance of such purpose, in a violent or turbulent manner, every person so offending, or who shall aid or assist in doing any unlawful act, shall be adjudged guilty of a misdemeanor, and shall be punished by imprisonment not exceeding one year, or by fine not exceeding five hundred dollars, or by both fine and imprisonment."

[3] In using the expressions "section 2-A" and "section 2-B", we mean, of course, offense A and offense B, as contained in Section 2 of said Act 193.

[4] See Smith and Brown v. State, *supra*, and Guerin v. State, *supra*.

[5] In Holdsworth's History of English Law, Vol. 8, p. 324, *et seq.*, there is a history of the old laws against unlawful assemblage and kindred offenses. *Riots* grow from *routs*, and *routs* grow from unlawful assemblies, so in the quelling of an unlawful assembly, a possible riot is extinguished. Likewise, in Bishop on Criminal Law, 9th ed., sec. 1256, *et seq.*, there is contained a definition and discussion of unlawful assembly. See also 66 C.J., *et seq.*; 46 Am. Juris. 127 *et seq.*; and Annotations in 58 A.L.R. 751 and 93 A.L.R. 737.

In *Roberts* v. *State,* 21 Ark. 183, decided in 1860, in a prosecution under the riot statute previously copied, this court said: "Riot is defined to be a tumultous disturbance of the peace by three or more persons assembling together of their own authority, with an intent mutually to assist one another against any one who shall oppose them in the execution of some enterprise of a private nature, and afterward actually executing the same in a violent and turbulent manner, to the terror of the people, whether the act itself was lawful or unlawful. Whar. Crim. Law 722; 1 Hawk. P. C. chap. 65, § 1; *State* v. *Conolly,* 3 Rich. 337."

Section 2-B[3] of said Act 193 of 1943 is aimed at the same generic offense as that towards which the riot statute was directed. As we will show in topic II, *infra,* dealing with the evidence, the defendants here actually participated in the acts of violence denounced in § 2-A,[3] although these defendants are now only charged with aiding and encouraging the unlawful assemblage.

In *Craig* v. *State,* 195 Ark. 925, 114 S. W. 2d 1073 we had before us another conviction under the riot statute (§ 3503, Pope's Digest, *supra*). In that case a labor dispute existed; and Craig, and at least two others, acting together pursuant to a common purpose, did engage in a riot. We upheld the conviction in that case; and the offense here invloved is of the same type as that in the Craig case.

In *Smith and Brown* v. *State,* 207 Ark. 104, 179 S. W. 2d 185 the late and beloved Mr. Justice McHaney delivered the opinion of this court, which sustained the constitutionality of Act 193 of 1943, saying:

"No one would seriously contend that force and violence, or intimidation and coercion, due thereto, are within the pale of constitutional protection. And the power to prohibit their exercise is within the police power of the state, acting through its legislature. 'The state', said Judge Hart, in *Huff* v. *State,* 164 Ark. 211, 261 S. W. 654, 'has the power to determine what acts committed within its limits shall be deemed criminal.

Having done so here, and having classified the offense here denounced as a felony, it cannot be said to be an arbitrary or an unreasonable one when considered in connection with the public good it seeks to protect. There is here no question of a labor dispute or of the right of peaceful picketing, but even picketing when accompanied by force, violence, intimidation or coercion cannot find any protection under the constitutional guaranties of freedom of speech and freedom of the press. *Local Union 313* v. *Stathakis,* 135 Ark. 86, 205 S. W. 450, 6 A. L. R. 894; *Riggs* v. *Tucker Duck & Rubber Co.,* 196 Ark. 571, 119 S. W. 2d 507; *Milk Wagon Drivers' Union* v. *Meadowmoor Dairies,* 312 U. S. 287, 61 Sup. Ct. 552, 86 L. Ed. 836, 132 A. L. R. 1200. In the last mentioned case, it was said: 'Freedom of speech and freedom of the press cannot be too often invoked as basic to our scheme of society. But these liberties will not be advanced or even maintained by denying to the states with all their resources, including the instrumentality of their courts, the power to deal with coercion due to extensive violence.'

"There the Supreme Court reviewed and distinguished *Thornhill* v. *Alabama,* 310 U. S. 88, 60 Sup. Ct. 736, 84 L. Ed. 1093, and *Carlson* v. *California,* 310 U. S. 106, 60 Sup. Ct. 746, 84 L. Ed. 1104, and said: 'Entanglement with violence was expressly out of those cases.'

"We conclude, therefore, that said Act 193 is not open to constitutional objection."

Appellants say that the statute prevents free assembly. We disagree with that statement. The Act prevents unlawful assemblages which cause violence and interfere with the rights of others. We hold: that § 2-B[3] charges a definite and certain offense; that it is within the power of the State to enact such a law; and that no provision of the State or Federal Constitutions or Amendments is transgressed by § 2-B[5] of the Act here under scrutiny.

II. *Sufficiency of the Evidence.* The record in this case is the same record that was before us when we

rendered our opinion as reported in 211 Ark. 836, 202 S. W. 2d 770. In that opinion we said:

"Facts incident to the difficulty between Campbell and Williams are set out in the opinion of October 7, 1946. There is substantial testimony in the record before us that Cole was on the scene where a group of strikers had gathered to await exit of Williams and others from the mill, five of the employees having remained at work. Cole carried a club, or walking stick. He told Willie Brown to go ahead, that 'they' were not after him—but, inferentially, were waiting for Williams. Jones said, 'Come on, boys', and strikers 'flew up like Blackbirds and came fighting.' . . ."

Did the defendants "encourage, aid and abet the unlawful assemblage?" Witnesses testified that the defendants spent most of the day of December 26th at the place where the labor dispute was in progress. That an act of violence was agreed upon is shown by the testimony of the witnesses, Bishop Jackson:.

"Q. You say you were down at the tent that morning? A. Yes, sir. Q. When these defendants here, Louis Jones and the others, were in a discussion and were talking about talking to the men that were working? A. Yes, sir. Q. And they agreed that if they didn't talk right, they were going to whip them? A. Yes, sir."

In other words, on the morning of December 26th the defendants participated, aided, encouraged and abetted in an agreement with others to the effect that the workers (Otha Williams, *et al.*) would be whipped if they did not agree to quit work. That this assemblage was "unlawful" is shown by the evidence of the violence that was performed in the afternoon of December 26th in keeping with the plan made that morning. The witness Willie Brown testified that, as he was leaving work that afternoon:

"Q. Did you start on across the street? A. Yes, sir. Q. All right. When you got started across the street, did any of them say anything to you or any of the men you were with? A. Yes, sir, Louis called Otha—

Q. That was Louis Jones? A. Yes, sir, and told him to wait a minute, he wanted to talk to him, and Otha told him he didn't have time, he was on his way home and he would see him another day. Q. Did he do anything else? A. He gave a signal and said, 'Come on, boys.' Q. He gave a signal and said, 'Come on, boys?' A. Yes, sir. Q. That was after Otha Williams told him he didn't have time, that he was on his way home? A. Yes, sir. Q. What happened after Louis Jones gave the signal and said, 'Come on, boys?' A. They flew up like blackbirds and came fighting? Q. They flew up like blackbirds and came fighting? A. Yes, sir. Q. You didn't see Roy Cole before you went across the street? A. No, sir, I didn't see him. Q. Did you see Cole after that? A. Yes, sir, he told me to go ahead on, that they wasn't after me. Q. The defendant, Roy Cole, told you to go ahead on, that they wasn't after you? A. Yes, sir. Q. Did Cole have any kind of a weapon with him? A. Yes, sir, he had a stick. Q. He had a stick? A. Yes, sir.''

It was in this encounter that a homicide occurred, so there is legally sufficient evidence that the appellants here, Cole and Jones, promoted, encouraged and aided the assemblage—which was unlawful because of its purpose and its accomplished results—and did, by the use of force and violence, attempt to prevent persons from engaging in a lawful vocation.

We therefore affirm the judgment of the lower court against Cole and Jones.

ROBINS, J., dissents.

Mr. Justice GEORGE ROSE SMITH did not participate in the consideration or determination of this case, it having been decided prior to January 1, 1949.